Good morning. You may please the court. My name is Aileen McGrath, and I'm here on behalf of the appellant, Vervent, and I'd like to reserve three minutes of my time for rebuttal, if I could. This case is about a RICO conspiracy that was formed in 2010, led by the for-profit college, ITT, to create a student loan program known as PEAKS, which would conceal from both the federal government and ITT's investors the extent to which ITT, a not an independent lender, was behind that program. But this appeal is not about the jury's determination that that RICO conspiracy existed, or even whether Vervent is a part of that conspiracy, despite its limited role as the subsequent loan servicer, which began only after every PEAKS loan had been issued. But it is about whether PEAKS loan borrowers are the right plaintiffs to assert that RICO theory, and whether they brought their lawsuit at the right time. And the answer to both of those questions is no, which is why the judgment below should be reversed. Plaintiffs can't satisfy RICO's important proximate cause requirement, because the RICO fraud that plaintiffs alleged and asserted was directed to the Department of Education and ITT shareholders, and plaintiffs' injuries. Counsel? Yes. Sorry. With regards to your approximate cause arguments, how, why aren't they even reviewable? How do we reach those arguments if the district court's denial of summary judgment inherently rested on findings of factual disputes as to approximate cause, and you failed to raise them, any approximate cause deficiency arguments on the Rule 50 motion? So we raised the legal question of proximate cause in both our initial and renewed summary judgment motions, and that was directly... The crux of my question is with regards to the factual findings part. Could you address that? I think what the district court was saying, the district court throughout his summary judgment ruling referred to genuine disputes of material fact. But I think as to the summary judgment determination, what he effectively did was pick between two competing legal rules that the parties had proposed. We had proposed, and what we continue to propose here, is the direct connection requirement that RICO demands under cases like Holmes. That's why in our summary judgment motion, we cited a case from this court applying the Holmes framework. Plaintiffs, where they opposed summary judgment, referred to the bridge case that they, like here, continued to invoke as requiring a foreseeability or but-for-cause standard different from the direct connection standard that we were advocating. And the district court effectively picked the latter as a matter of law, not as a matter of fact. And that's on page 60 in his ruling on the first motion for summary judgment. The district court articulated a but-for-cause or foreseeability test when he said, had the loans not been made using the mail and wire systems, and had defendants not assisted in servicing them, plaintiffs would not have made payments to defendants. It's a pretty tough standard, because don't we have to construe all the facts in plaintiffs' favor here? We agree that the court has to construe all the facts in defendants' favor. We think as a matter of law, those facts, like in every case that applied the rule that we are advocating, which is that proximate cause is not satisfied when a theory of fraud is directed to third parties, all of those cases decided that question as a matter of law, based on the facts, the undisputed facts, or in many cases, based on the allegations and the complaints, several of those cases were decided at the pleading stage. And here, there are no disputed questions of fact about what plaintiffs' theory of fraud is. Plaintiffs have been clear throughout this case that their theory is that the peaks loan program defrauded the federal government into believing that ITT complied with the 9010 rule governing eligibility for federal financial aid distribution and misled. But what if we disagree with you, that you're reading all the proximate causation case law too narrowly, that it's not just, oh, is it relating to a third party? It's really a question of, is there direct relation to the plaintiff's harm? I'm not saying that proximate cause is a legal question in every case. I'm saying that it's a legal question in a case like this one, where the question is about the theory of fraud asserted and whether that theory of fraud has the necessary direct connection to the injury that the plaintiffs want to assert. In Holmes, Anza, Hemi, this court- I know, and that's where I'm disagreeing with you. They don't just, as a categorical rule, say that you can't have proximate cause here where the plaintiff claims to be injured by fraud targeting a third party. I don't think they're that broad. You just look at whether the fraudulent racketeering scheme is directly related to the plaintiff's harm. I think you- I actually disagree, Judge Koh, with a very small way that you're articulating that in the sense that we think that those cases require a direct connection between the predicate acts of racketeering. So that is the fraud and not the broader fraudulent scheme. And I think Anza speaks pretty clearly to this, where Anza said- And you were quoting from what the district court did. And I'm also looking at ER 60, where the court said, defendants note that they were uninvolved with Turey enrolling or taking out the loans, but the predicate RICO acts that plaintiff alleges relate to the underlying fraudulent scheme. Had the loans not been made using the mail and wire systems and had defendants not assisted in servicing them, Turey would not have made loan payments to defendants. So your view is, as a matter of law, even if everything the district court said there is true and correct, you win anyway. That is correct. That is our position. And as to where we think the district court went wrong, and this goes back to what I was saying to Judge Koh about why we think Anza controls here. In Anza, it was intended to injure the plaintiffs. That's one of the cases that arose at the motion to dismiss stage. And the plaintiff's theory was that the defendants had defrauded a third party, the New York State government, in order to drive down prices to obtain a competitive advantage over the plaintiff. All of that was assumed to be true. And the Supreme Court still drew a line between the fraud in the case. The fraud was directed to the federal, to the state government. And that fraud, this is on page 458 of Anza, I think is the most helpful. That fraud defrauded the New York State government and directly injured that entity. Plaintiff's entities were related, but that wasn't enough to show the direct connection. And that's exactly the point that we're making here. The direct victims of this fraud were the federal government, which dispensed financial aid that it shouldn't have and wouldn't have had it known of the fraud. And it was ITT shareholders. Both of those entities, both not only had their own injuries, but sued to vindicate them. And so that is what we think differentiates this case and brings it within the legal framework that cases like Anza in particular set out. I would like to return, if I could, unless there are more questions. And I'm happy to say more about proximate cause, but I also do want to focus on the statute of limitations, which is an independent reason that we think that the judgment below needs to be reversed. Here, plaintiff's theory is that they were injured by their loan payments. RICO imposes a four-year statute of limitations that runs from the time that a plaintiff knows or should know of their injury. Here, it is also undisputed the plaintiffs knew of their loan payment injuries once they began making loan payments no later than 2013. On the should know part, Harman was your guy, right? Yes, that's right. And didn't Harman testify extensively that given statements about this, this, this, this, and this, did that look normal to you or abnormal? And didn't he say multiple times, nothing, nothing raising any hackles there, look, look normal. Nobody would have thought that that was something wrong. Well, I think that the jury ultimately disagreed with us about that, your honor. But more importantly, I'm talking about your guys, your guys actual testimony, right? His testimony was directed to a separate question, which is whether he didn't dispute whether any of these circumstances existed. What he was disputing was whether they rose to the level that they could have released Vervent from its contractual obligations. No, I mean, I understand why you wanted them, but it seems to me that it definitely goes to the issue of whether the plaintiff should have been aware of these things. Well, here, every plaintiff testified at trial, each representative plaintiff, that at the time that they began receiving requests to repay their peaks loans, they had no idea that they had taken out those loans to begin with. I think that any reasonable borrower who receives a request for repayment on a loan that they don't know about is on constructive notice of the possibility of fraud surrounding that loan. Well, let's look at what your expert said. You know, when you review the materials, do you find any of those investigations involving allegations of wrongdoing on the part of the first associates or activate financial? No, none of the material that I saw alleged any improper or inappropriate activities on the part of either Activate or Vervent as the servicer of the loan. If you look at the major features and functions that occur within a student loan program, they have an application process and a review and approval process and a disbursement of funds and all of those things occurred on a regular consistent basis. It was, from my perspective, a legitimate functioning program. And also your own CEO testified that, you know, they asked, well, you know, he said there were just arcane rules, accounting rules that were the subject of the government investigations and he doesn't even pretend to understand them. He said he was not at all concerned about the enforcement actions because no one had ever said, hey, you shouldn't do that, quite the opposite. So both your own expert and your own CEO say there was nothing here that would have put us on notice that anything was amiss. So how are you saying unsophisticated students, unlike your own expert and your own CEO, if they don't know, how would a student know? I think any student that receives a request for repayment on a loan that they don't recognize is on notice of the possibility of fraud surrounding that loan. Okay. But then what about your letter, April 1st, 2013, saying the above reference loan became delinquent in June 2012. Due to this delinquency, negative credit reportings have been sent to the credit bureaus. In November 2012, your loan qualified for a, quote, recovery program, end quote. This means that your loan was in danger of default. Your past due balance of $232.51 was paid for you and your loan was brought current. Again, in March 2013, your loan qualified for the recovery program. Your past due balance was paid and your loan was brought current. So those communications regarding the payments that were made on behalf of borrowers, none of that concealed anything that had to do with whether the borrowers knew about the loans in the first place. I think the other things I would say about that letter is that that program stopped in 2014, which is still outside the limitations period, and it wasn't directed to any of the plaintiffs in this case. But beyond that, I think what I would do is to back to proximate cause to the extent that the loans and loan irregularity- Before you go back to proximate cause, I want to talk one more minute about the statute. You didn't ask for a special interrogatory, right? As to the statute of limitations? Yes. No, we did not. And you did not have a special instruction? No, we took the position. We raised- But your answer to my question is you didn't. Yes. My answer is we did not. So you're asking us, as the appellate court for the information that I talked about, that Judge Koh talked about, you're asking us essentially to make a factual determination that the plaintiff didn't have constructive knowledge because it had enough information to warrant an investigation which, if reasonably diligent, would have led to the discovery of fraud. You're asking us basically to make that there's no facts in the light most favorable to the plaintiffs that could support that determination. Yes, that is our position. We raised this issue in the Rule 50 posture, and we recognize that is the same posture that we're raising it before this court that turns on whether any reasonable jury can reach a different conclusion. We think that standard is met here in light of what plaintiffs themselves testified about what they knew about their loans. But even if you disagree as to all of this with respect to the loans and whether plaintiffs knew of their injury, we still think independently that injury isn't sufficiently connected to the RICO theory of fraud in this case. Plaintiffs have never explained how their injuries are connected to a pattern of fraud that was directed to the federal government and ITT shareholders. And the reason the plaintiffs have connected their loan payment theory to fraud directed elsewhere was to help ensure that this claim didn't meet the same fate that their other claims that were brought and pursued right up through trial met midway through trial where the district court recognized that claims about the loans, claims arising under federal and state debt collection laws, a negligent misrepresentation claim, were all inherently individualized and couldn't be decided on a class basis. And that's why plaintiffs went all in on their RICO claim at trial because that theory of fraud didn't turn on different representations made to the class members. But it destroys the necessary connection to the injury because the directly injured parties were the federal government and ITT's investors who could and did come forward to seek an attempt to recover for those injuries. Plaintiffs' loan payment injuries, as they acknowledged at trial, were at most collateral damage of that theory of fraud. And that collateral damage theory doesn't meet the direct connection requirement that the Supreme Court has demanded. Thank you, counsel. You've used your time, but we'll give you two minutes for rebuttal. May it please the court, Timothy Blood for the appellees. This appeal comes to court after a full trial on the merits and a unanimous verdict. Appellants do not challenge anything that happened during trial, not the admission of evidence, not the jury instructions. Can you address your opposing counsel's argument? I read what's on ER 60 and 61, and it definitely looks like a factual dispute. But can you address your opposing counsel's argument that the factual dispute was premised on legal error? Yeah, it wasn't premised on legal error. First of all, the rule of law presented at trial was the one presented in Jury Instruction 20, which is the causation instruction, which was the instruction that the defendants proposed to the court and the court adopted. That proximate cause jury instruction, by the way, is essentially the 11th Circuit Pattern Instruction. So this was a, the proximate cause instruction was theirs. And the reason they did that at trial, it was a strategic decision, and Judge Koh, you illuminated to it. The trial was really about defendants' knowledge. And so the defendants had to argue, we saw nothing. There were no red flags to us. We received the documents about the loan program, the PEEX program, all sorts of abnormalities about this program before we even signed on as loan servicer. All sorts of abnormal things happened. But to us, nothing was abnormal. Everything was completely normal. Defendants then, many of those same facts in the Rule 50 motion, they turned around and said, no, no, no, no. There's no, there is no statute of limitations issue here, or rather, the plaintiffs' statute of limitations would have run because they would have been on notice. I'm just confusing my two arguments. I'm sorry. They would have, the plaintiffs would have been on notice had they, had they known about these facts. And so they should have known. But at trial, they had to argue, look, we, the loan professionals, did not know anything about this because they wanted to win on liability. And so therefore, the class member, they never raised the statute of limitations argument because they couldn't very well say, well, the loan professionals didn't know about it. The student borrowers did know about it. And that's why they never raised the statute of limitations argument. And it's your view, that's why they had, that's why they emphasized Harmon's testimony. There's nothing going on here. Move along. Everything's normal. Nothing going on here. We couldn't possibly have known about it. Even when there were government investigations, not about naming them as, but even with government investigations, they said, we didn't know, you know, that didn't put us on notice of anything. There's investigations all the time, particularly in the not, in the for-profit college arena where there's lots of investigations because of allegations of abuse and predatory lending activity and things like that. Not, not anything like the PEAK scheme, which is a completely different sort of loan program. And so that was their argument throughout the entire trial, which is why they never asserted statute of limitations. And then they asserted. You know, I'm looking at instruction number 20 and it's at such a high level of generality. I don't really see, you know, which theory, frankly, is being adopted. It just says the damages plaintiffs and class members may recover those caused by the predicate acts committed by members of the conspiracy that injured plaintiffs and class members. So if they, so I think it's rather commonsensical that in a student loan program, if somebody pays on their student loan and the student loan program itself was a fraud, that the injury is the payment on the student loan. That's a direct injury. And, and so, so defendants could have asked for a different proximate cause instruction and plaintiffs could have argued whether that was proper or not proper. And the district court would have had an opportunity to hear those arguments and make a determination. But defendants are the ones that, that said, this is the instruction we wanted. The 20 is their instruction, including the 51 million number. Yes. 20 is their instruction. And, and, and the reason why they did that is because at trial, and there's lots of testimony on this, what they wanted to argue was, hey, the students got what they paid for. They had to come up with tuition for an ITT tech education. They paid for an ITT tech education through student loans, including the peaks program. They got what they wanted. And now they're actually even better off. And they, they argued that right. And they, they argued that they elicited testimony at trial and argued that at trial. And, and I think it's fair to say that, that we don't know. But then what is the injury? If it's true that these plaintiffs got a degree, they're now earning more than they would have before they went to ITT and got these fraudulent loans, their loans have been canceled. What is their injury then? Well, the loans were canceled, but the people who paid on those loans didn't get their money back until this lawsuit. This is the only lawsuit where the people who paid on those loans got money back. There was an enormous, very high default rate, 60%. Those people's loans were canceled. But if they got the education, what's the injury? They would have owed something, right? Well, they would have owned something. And there were test, there was testimony at trial that where they got the tuition from, it's all part of the scheme. The, the, the tuition was derived not from how much it costs to provide an education plus a reasonable profit. The, the tuition amount was calculated based on what is the maximum amount of federal student loan money ITT could recover. And then you back into that under the 90-10 rule, you back into that, what that 10% has to look at. Can you respond to the opposing counsel's argument that, that you argued in closing, I don't know if it was you, if it was a colleague or someone else representing the plaintiffs, that the plaintiffs were collateral damage, so that the real fraud victims here were the investors and the government? Well, the, the investors, the investors were certainly suffered harm. The government obviously suffered harm and the students obviously suffered harm because they are the, the ones that made the payments on a fraudulent student loan program that never should have existed in the first place. And had they been truthful about it, never would have paid money in the first place. And this is a student loan program. So what's required with a student loan program is the implementation of the program, or the creation of the program, the securitization of the, of the future payment stream under the program for investors, but also the billing and collection on that student loan program. Because if they never billed and collected, if they never did that, they just created the program and then nothing ever happened, the program would have collapsed before it ever got started because investors wouldn't have gotten anything, regulators would have come in, and the whole scheme would have failed. You know, this, what was happening with ITT at the time was the credit market dried up. So they couldn't get that 10% that they needed. I'm going to ask you for your theory of injury. Do the plaintiffs have to know that their injury is a result of vervent, or is it just enough that they know there's this fraudulent scheme involving ITT and their student loans? They had to know about the fraudulent scheme to create a fake loan program that ITT and Deutsche Bank created. It's not merely the payment on loans. Many of them knew they took out peaks loans. Many of them knew they took out all sorts of different loans. That's sort of the business model for ITT tech. So they knew that they took out loans and they were, and so when they got a bill for a loan, nothing unusual there. They got the bill for the loan and then they paid money on the loan. So there's nothing unusual about that. What's unusual about this loan program was that it was a sham. It was an artifice. Can I ask you, it seems like both sides are kind of making contrary arguments on the proximate cause and the statute of limitations. You're both kind of going in opposite directions because at trial, since as you say, Vervent's defense was, we didn't know anything was amiss here. This is all ITT and Activate Financial or whomever, the other Recteor and co-conspirators were responsible. So then your expert submitted, I'm looking at their declaration that says, ah, these loan documents so obviously, so clearly defective would have put anyone on notice. So aren't you also kind of in an uncomfortable position now on statute of limitations? Not at all. And this, I think, this is critical and goes right to waiver. So if there was a statute of limitations defense, we would have had the opportunity to put on equitable tolling arguments, which in this case, since the knowledge of the fraud and the knowledge of the payment is sort of the same thing, we would have been able to explain that class members had no reason to believe that even though they were getting billing notices, that there was anything amiss with the Peaks Loan Program until very far into the future. But why? This expert says, hey, these applications, they don't have an interest rate. They don't have repayment terms. This is so obviously defective. Somebody would know looking at the face of these documents that there was something amiss here. Not somebody, loan professionals would know. Student borrowers wouldn't know. And because it was not an affirmative defense offered a trial, it wasn't an issue whether or not anything was timely. It was not an issue at trial. That's why it's waived. I mean, had they made it an issue at trial, then inevitably it would have been a different trial. I think they would have been in a very tough spot because they would have had to say, well, we didn't know any about anything. All of these facts that existed never put us on notice. We didn't. There were no red flags here for us. But those students, they should have been on notice. And that's really not a winning argument for the defendants that the loan professionals would know about it, but trade school students would have known about it. But so they made a strategic choice. And the timeliness of the lawsuit, statute of limitations, was simply never an issue at trial, which is why it's waived now. You're free to not use all your time. I was going to say, I think I've said everything I wanted to say. No one will ever criticize you for that. Thank you very much. Thank you. Thank you, Your Honors. And on the proximate cause point, and frankly, as to both points, I think what I heard from my friend on the other side is consistent with the argument that we're making. In describing their theory of causation on proximate cause, plaintiffs say that because the Peaks Loan Program was a sham, that that somehow invalidated the loan program in its entirety and entitles plaintiffs to all of their money back. That is a but-for theory of causation at most that the Supreme Court has rejected. And what it also illustrates is that this case from the very beginning was litigated very broadly. Plaintiffs brought and tried to pursue broad claims about the loans, about the disclosures, about representations that were made to the court. But all of that was abandoned by the time the case went to the jury. And what went to the jury was about a very specific course of conduct directed to the federal government and ITT shareholders. What proximate cause precludes is what plaintiffs are trying to do, which is to go to trial on that narrow theory, and then try to use it to sweep in damages that plaintiffs may have under other theories that plaintiffs decided to drop. But what proximate cause forbids is them RICO as the hook to try to pursue those claims. Very briefly as to the statute of limitations, here, too, we agree that the evidence at trial was complete. Plaintiffs' whole theory was that the loans were obviously defective on their face. We disputed a very narrow question about whether those defects would have allowed Vervant to stop collecting on those loans. That's a different question from whether the plaintiffs knew of those defects as they admitted at trial, let alone whether the CFPB and SEC complaints that later formed the template for this very lawsuit could be a basis for constructive knowledge as well. And so here, when plaintiffs knew of their loan payment injuries, they knew, and it's undisputed, of circumstances suggesting irregularities, and any investigation would have led to the very complaints that plaintiffs later five years later in this case, then that's enough as a matter of law to show constructive notice.
judges: BENNETT, KOH, MENDOZA